The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

**Stenographic Reporter note:**

**No AI technology was used in the preparation of the Official Certified U.S. District Court Transcript**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| BIC CORPORATION, et al. | ) | Docket Number 1:25-CV-5048-SDG |
| Plaintiffs, | ) | |
| v. | ) | Atlanta, Georgia June 23, 2026 |
| TRIDENT WHOLESALE, INC., et al | ) | |
| Defendants. | ) | |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE STEVEN D. GRIMBERG
UNITED STATES DISTRICT JUDGE

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFFS: MR. RICHARD HENN
MR. TROY VIGER

FOR THE DEFENDANTS: MR. ROBERT RIGRISH
MR. HARRY WINOGRAD

OFFICIAL COURT REPORTER: ALICIA B. BAGLEY, RMR, CRR

Proceedings recorded by mechanical stenography, transcript produced by computer

P R O C E E D I N G S

(in Atlanta, Fulton County, Georgia; June 23, 2026; all parties by Zoom)

THE COURT: All right. Let me call the case. This is BIC Corporation v. Trident Wholesale. Case Number 25-CV-5048. Let's have appearances of counsel beginning with the plaintiff.

MR. HENN: Good afternoon, Your Honor. I'm Charlie Henn with Kilpatrick Townsend. Also with me is Troy Viger and we're here on behalf of BIC.

THE COURT: Good afternoon.

MR. RIGRISH: Your Honor, Rob Rigrish of Bodker Ramsey with Harry Winograd who's also here. Farooq Gandhi, the principal and named defendant, has joined us as well.

THE COURT: All right. Good afternoon. Good to see you both.

MR. WINOGRAD: Good to see you.

THE COURT: All right. We're here on BIC's motion for discovery sanctions. I did review the parties' briefing.

Let me hear from counsel for plaintiff.

MR. HENN: Thank you, Your Honor.

As you know, we were here -- or we were virtually here a couple months ago on a motion to compel. During that hearing the Court ordered various forms of relief and counsel for the defendants represented that their production at that point was already complete and fulsome and the Court said explicitly that if that representation

turned out not to be the case we should seek sanctions. We have documented numerous examples in our papers as to why that representation was false and why the production by the defendants has never been fulsome or complete since the beginning of the case.

The motion for sanctions is grounded in two pieces, I would say. The first is violation of the Court's orders. The second relates more to just a fundamental failure to participate in the discovery process as is required by the rules.

So if we start with the violations of the Court orders, there were two court orders that relate to the imaging and production of materials from two phones that were seized at the time of the seizure. The defendants failed to comply with that in several ways.

First, it is not clear to us when the imaging of those phones actually occurred in response to the Court's initial order back in September of last year. The file name on the imaged files is not -- is dated in December which we suggested in our reply brief suggests perhaps it occurred later.

Moments ago I was handed an invoice from TransPerfect suggesting maybe they did in fact image it in September. But regardless, there's evidence that texts on the phones were deleted. We highlighted one example of that in our briefing which suggests that there was at least some potential lost evidence as a result of when the imaging occurred.

We raised this issue during the motion to compel hearing and Your Honor said, okay, let's get a report from the defendants on how

that phone was imaged and give the details. We did not get a detailed report. We basically got a hit count from TransPerfect's capture of the phone. There was no detail about how it was imaged, for example, when it was imaged, which is why we have this question about when it occurred. Not that it's material, but even with regard to that report it wasn't delivered timely. The Court set an April 13th deadline. The report was received the following day.

Also, the Court set a deadline of April 13th for supplementation of any other discovery in order to make that representation to the Court true and nothing was produced on the 13th. The image reports were provided the following day.

We did receive on May 13th, a month later, a massive quantity of native PST files from two generic email addresses. One that was like Purchases@GandhiWholesale and the other was Orders@GandhiWholesale. There were no Bates numbers. There was no pre-review by counsel of those. In fact, there was an email that came with it that basically said there's probably some privileged stuff here. If you find it, be sure to segregate it and send it back to us. Those were produced as native PST files in violation of the parties' signed ESI agreement. Granted, it was signed by former counsel, but it was signed on behalf of defendants. In that agreement the parties agree that when they produce ESI they would not just produce un-Bates numbered native PST files, but that they would do it the way that normal civil litigants participate in discovery.

In short, there is substantial evidence that defendants

violated the Court's orders with regard to the phones and also with regard to the deadline for supplementation. That's the piece of the motion that relates to violation of orders.

Separately and also as evidence of that representation to the Court not being truthful, there are several ongoing issues with defendants' approach to discovery. They were highlighted at the motion to compel, so I won't belabor the point. But just to sort of list them here for the record on this motion. Defendants have never in this case identified custodians likely to have responsive documents, conducted interviews of them, collected their ESI, reviewed it and produced it. The only thing that has occurred is the imaging of the two phones this Court ordered that we happen to get the day of the seizure and the production of the PST files from the generic email accounts.

Now, we've started to go through those generic email accounts because it's all we've got and we have a deadline coming up and it turns out, as we outlined in our briefing, there are several individuals who are actively engaging in communications about the purchase and sale of BIC lighters and those are from accounts other than the @purchase and @offers emails accounts.

So for example, we identify someone named Nazar Gandhi or maybe Sirwani is the last name. There's an Amir Gandhi. There's someone named Sadiq. There's an Achmed Sayed (phonetic throughout). There's several people who are engaged in communications about the purchase of BIC lighters.

Just to draw a point on why that's important that those custodians actually be identified -- and, by the way, there may be others that we're not aware of. But it's going to be of critical importance if this case gets to trial and different terms of determining statutory damages to which BIC is entitled based on whether the counterfeiting that occurred was willful.

We know there was counterfeiting. We seized over 50,000 counterfeit lighters plus another 100,000 gray market lighters so that's not going to be the issue. The issue is going to be are they going to have to pay the lower level statutory damages for non-willful counterfeiting or is there going to be evidence of willfulness.

We think there's circumstantial evidence of willfulness based on the price they were paying for these things. But we believe that the communications, the emails, the WhatsApp messages and the text messages of these individual custodians are where those communications about whether they knew these were fake are likely to exist.

I mentioned that they've never looked at custodians or collected their ESI. Even with regard to the two people whose phones were seized, there is no indication -- and this is true also for all the other potential custodians -- that there has been any effort to collect or produce materials in cloud storage, any phones from anyone other than the two individuals whose phones were captured the day of, or, significantly, WhatsApp communications which are cloud, but they

exist in an app that might sit on a phone.

We know from communications that were produced by third parties subject to document subpoenas that there is active both texting and WhatsApp communications. All of this was presented to the Court on the motion to compel. All of it was presented with counsel who was here -- was present on that call. No effort, as best we can tell, has been made prior or since that hearing to do the basic discovery that is required in any civil case.

Two final points. The unilateral rescission of the ESI agreement and producing documents in violation of that agreement to us also is sanctionable conduct.

Finally, the Court specifically ordered a review and supplementation of the defendants' interrogatory responses. Nothing changed in those interrogatory responses, they still are deficient. We cite in our papers many examples where what is in the interrogatory response is directly contradicted by documents we either received from third-party subpoenas or that we have been able to find in the massive, unorganized collection of ESI that was produced.

Finally, I would just say that we identify three potential sanctions in this case. I recognize that some are more Draconian than others. I've been doing this awhile. I've never seen this kind of discovery misconduct which is why I believe that all three forms of relief are appropriate here. We do cite authority for each of those forms of relief.

One is an adverse inference of willfulness because we can't actually get the documents that might bear it out.

The second is an order that would compel the production of all of the cloud accounts, ESI, phones, email accounts, etcetera, for the custodians we've been able to identify so that we can do our own forensic examination and collection of those.

Then, of course, the last is for fees and costs associated with all of this nonsense that we have been going through for months to get basic information.

THE COURT: Speaking of your request for relief, it struck me as sort of premature to be asking for an adverse inference when, even by your own acknowledgment, you still don't know the extent of what is missing; right?

MR. HENN: Right. But the case -- and the cases we cite for that adverse inference sanction contemplate that. They basically say in cases where the defendants are essentially not giving you the documents where the evidence of willfulness would exist, it's appropriate to say, okay, you must be hiding it and therefore there should be an adverse inference that the reason you're refusing to give over all this information is because there's bad stuff in those files and in those text messages and in the WhatsApps and so we're going to infer that there is willfulness and you're just not giving us the documents.

We point out in our papers that obviously we'd rather get the documents because we think in front of a jury it's going to be much

more effective to have the evidence than you reading them an inference. But it is an appropriate sanction in a case where the defendant simply won't give you the documents.

THE COURT: Right. But I guess my point is if we were to get there, right, if we were to get to the point where you did get the documents, you could answer that question yourself, was there evidence of willfulness that was not being disclosed. At that point we could deal with the reality and the truth of it rather than speculation.

MR. HENN: That is true. You know, in light of the fact discovery period closing in a couple weeks, we would need to do some adjustments to the schedule. We would have to deal with the costs that are involved in this additional exercise and having fee shifting, those sorts of things. But you're right, that is a form of relief that could properly be deferred and denied without prejudice, if you will, once we get the material.

THE COURT: Have there been any depositions taken?

MR. HENN: No, because we haven't been able to get the documents. We were worried about the upcoming deadline so we did serve recently a 30(b)(6) notice and a notice of Mr. Gandhi for the week of July 4th like towards the end of that week. I don't remember the exact date. We offered July 2nd. We offered to, you know, confer on the scope of the 30(b)(6) notice and all that stuff. But, frankly, we need the documents in order to do that effectively and we don't want to have to depose him twice. So my expectation has been

that we did that sort of to make sure we weren't prejudiced with the close of discovery, but that that would likely need to be rescheduled until after all this.

THE COURT: Are you asking for an extension of the discovery period?

MR. HENN: I will depending on the relief you grant as a result of the sanction motion.

THE COURT: Okay. All right. Thanks.

MR. HENN: Thank you.

MR. RIGRISH: Your Honor, I was expecting Ms. Nelson to be here, but I understand she delivered her baby early from Mr. Henn.

THE COURT: Mazel tov.

MR. HENN: She did, Your Honor. In fact, I was supposed to say that first. The whole reason we had this hearing today is because she was due three weeks from now. But she had her baby on Friday, all is good. A 5-pound baby. I've seen pictures. Very hairy baby, but cute.

THE COURT: Well, send her my best and tell her that you would have started on a stronger footing with your argument if you had started with baby pictures.

MR. HENN: I'll be sure to tell her that.

MR. RIGRISH: Your Honor, I'm late to the party. We came into this case at the end of January. But I have familiarized myself with the history before that with Steve Kushner at Fellows LaBriola and plaintiff's order part of their motion is based on a couple of

misunderstandings.

The first is a misunderstanding of the report which we provided to the Court on April 13th which is when we did produce the documents with that. That was a report which was generated at 1:57:31 p.m. on December 17th, 2025, which was a report of what TransPerfect had done to review the two phones data to come up with what was responsive. That report was on 12-17. The report name is 2025-12-17 because that's when they ran the report.

Now, why did they not run the report until December? Well, a predicate to running the report is learning from BIC what terms they wanted to search the phones for. I don't know specifically when that report was provided by BIC to my predecessor. The things I've seen suggest that it was in November or early December around the time that my predecessor signed this ESI agreement which talked about what all was going to be in a production of ESI and so they couldn't run the report until they knew those things, the search terms, and that does not mean -- and the report on 12-17-2025 doesn't mean that the phones were imaged then.

In fact, the phones were imaged as the Court had ordered in September and I've shared with counsel the invoice from TransPerfect where my client paid $7,000 to have all this done and so the premise here, the misunderstanding, is that your order of September 16th wasn't complied with. It was. The phones were imaged. It took awhile to do the report, which was done on 12-17, in part because BIC didn't tell us what to search for.

So in any event, they did the search using those terms and that's what this report shows because it breaks it down by the search terms.

THE COURT: Was there communication between September and December about who was waiting on who?

MR. RIGRISH: I've not seen anything from my side from what I got from Steve Kushner other than that there were discovery disputes at play in mid December that continued forward and then we got involved in the case, again, late in January. What was communicated to work that out, I don't know, because at the time we had our hearing with you, the Zoom hearing, on March 12th we understood that the phones had been both imaged and the search terms run on them and the report and the data produced. That was our misunderstanding.

When I talked to Steve Kushner and he emailed us the next day, the 13th of March, he said, yeah, we've done that, it's been done. Then he came back an hour or so later and said wait a minute. Sorry. It's been done, but we haven't produced it, which led us, then, complying with the Court's direction from March 12th, to go ahead and get that information from TransPerfect.

I didn't look at it. It was identified to me with this report as being the data that they ran and I was working on the assumption that Mr. Kushner and TransPerfect had done what appeared to be the case from having an ESI agreement and the data and the report that it had been done and produced. It turns out it hadn't, okay. So we produced it in accordance with the Court's order at the hearing on

March 12th, which we'll talk about more in a minute, on April 13th and a week later Ms. Nelson contacted me on March 21st with an email saying, hey, this doesn't comply with the ESI agreement that we had with Steve Kushner. I said okay. I'll reach out to TransPerfect. I did. TransPerfect confirmed that they had the data, but they had not run that. They charged my client -- although we thought we had paid for it -- they charged us. We did it. We produced it. We produced those by May 5th.

Ms. Nelson had some technical issues with getting the data collected, but that got signed out by May 7th. So they have had the phones, the data -- the phones and the data on the phones since April 13th as the Court directed, including TransPerfect's report of what they had done.

Then when it was raised to us on April 21st that the format of the big data files, 8 gigabyte file, didn't conform to the agreement that had been reached on ESI. I said, okay, we'll do that, too, and did it and produced it and it was produced on May 5th. So they've had since May 5th the phones which are the phones of the two people who are the people who run this business making purchases and handling sales. Primarily purchases.

THE COURT: But the report -- I haven't looked back at the transcript from our hearing, but I recall that we talked about the report being a forensic report that explained the methodology by which the imaging took place and what I'm hearing is that this is just a hit report.

MR. RIGRISH: Well, that's the same thing, Your Honor. There isn't a document prepared by TransPerfect that goes through and lists you gave us this, we did this, but it shows that. It shows that we've got the data, here's what the result was of that data. We believe that the report that they did on December 17th conformed with what the Court had directed and what you had directed, Your Honor -- and I'll refer you specifically to it.

"With regard to the phones, I've ordered defendants" -- this is Page 30 at Lines 4 through at 9 of the transcript which I think has been filed at Docket Entry 80-1. What you said is "I've ordered defendants produce documentation - I don't know if that's in the form of a report or otherwise - from the service that provides an explanation as to the manner in which the phones were imaged and the manner in which those images were searched for the discovery requests that were made." That's what this report does based on --

THE COURT: It doesn't sound like it.

MR. RIGRISH: I'm sorry?

THE COURT: It doesn't sound like it.

MR. RIGRISH: I don't know what the Court expected beyond a description of what TransPerfect did and what the result was and then the production on what the result was, but they've got that. Particularly since we went back, after Ms. Nelson complained about the form of the report that was produced on April 13th, we went back and had TransPerfect generate one and I heard no objections since May 5th to that report capturing -- or what they did capturing what

they did. They've got it.

Was there delay in this occasioned by the turnover in counsel? Absolutely, there's no question that that's the case. But they've gotten what they need and we believe we've complied with the Court's order on this.

The first part of that -- again, there's two parts to the phone issue. The first is you order on September 16th that the phone be imaged. It was imaged by TransPerfect and we've provided the invoice to counsel showing what that is and we can provide a copy to you as well if you need it, Your Honor.

The report, then, that was given, which is what was the premise of the argument in the reply brief that, oh, they didn't image the phones because all we have is this report from mid December. If you read the mid December report from TransPerfect, you see that it says nothing about when the images were collected. What it does show is that there was some point where BIC had to identify what they wanted them searched for for the search to be done and it was on December 17th. Again, we weren't involved. I don't know anything about it until we get it at the end of January and February.

So on that first point about the Court's orders, specifically the orders going to the two phones, we're in compliance with the Court's order and we've engaged in good faith efforts to get discovery rolling on those points. They have them. I've heard no complaints about what was obtained from the phones which include -- they are the custodians of the real records of communications. Were

there other people who occasionally, a sales clerk or somebody who's filling an order, maybe. Answering a WhatsApp inquiry about do you guys have these, maybe. But the people who are making the decisions who are involved were the two people identified by BIC whose phones they wanted in September and they got those phones and those phones have WhatsApp on them in addition to the WhatsApp messages that were seized on September 15th.

This is different than a lot of cases in that the plaintiffs had early discovery of our business records and got them to the tune of over 30,000 pages of PDF-stamped documents when they got them that lay all the stuff out. They got stuff off the cloud. They got WhatsApp entries.

The fact is in the documents that they include with this motion for sanctions that goes to a later issue, which I'll discuss in a minute, the question of our production and response to production Request Number 35 and Interrogatory Number 12, they referred to the documents that they seized on September 15th and not anywhere -- and I've never seen it. It was mentioned at our hearing in March. I've not seen anything to suggest that anything that was obtained from a third party suggests otherwise.

Are there confirmations that they used WhatsApp? Yeah. And they've got WhatsApp. They got it in the seizure and they got it in the phone records, too, if they've looked at them, I don't know. I haven't gone through trying to look for the things that they've tried to suggest they need to get in discovery that are in there. But

they've got the phones of the two key actors. They've got them imaged from the date the seizure occurred.

If there's an indication in some WhatsApp in there that something was deleted at some point it was because it was deleted in the ordinary course of business before this ever came up. That's why it was captured on September 16th as being deleted. It's not a question of spoliation of evidence. They've got the evidence and the few examples that they have are ones that demonstrate that they do have that evidence. Okay. That's the order issue -- the first part of the order issue.

The second goes to what else the Court ordered us to do and it went to four interrogatories and the production of who we bought from and who we sold to - BICs. That had all been either seized in September or produced by my predecessor in November to the tune of over 20,000 pages of PDF documents that they've had since then.

What you suggested on March 12th is you guys need to look at those interrogatories and see if you can answer them better to make it easier for the other side and we did. We had spreadsheets put together from those same records assembling those from our computer systems to show who we bought these BIC line items from and who we sold them to and they've had those.

There were two spreadsheets dated 03-27-26 that they've had since the production that we did on April 13th to show that to allow them to then look at the 20,000 pages of documents which are mostly invoices and purchase orders produced by my predecessor in November

and go back and look at what they seized which, again, was over 30,000 pages of documents and those were mostly purchase orders and sales, so they've got all of that. We answered those and we've complied with the Court's order and they don't raise a concern about those. So we've got those. Interrogatories 1, 2, 8, and 9. And the spreadsheet includes prices paid. Although the other information they ask for. Okay. We made it easier for them with that and we complied with the Court's order with that.

The last point that was raised in their motion, which is a misunderstanding, is their representation in the reply, which is Docket Entry 83 at Page 4, which read the Court's order as ordering the defendant to confirm that no amended or supplemental responses were necessary beyond those specifically ordered.

Your Honor, the transcript, Line 30 -- I'm sorry. Page 30 at Line 16 through 18 doesn't say that. We were directed specifically to address one additional interrogatory and one request for production and we did. Interrogatory 12, Request for Production 35.

What the Court ordered at that time -- this, again, is 30, Line 15 through 19. "I've ordered a supplemental response to Interrogatory Numbers 1 and 2. In addition to that, I will just urge counsel to review all the responses that have been served to date in light of this conference," and Ms. Nelson mentioned Interrogatories 8 and 9 in the first set. "I would say it would be prudent to review all of them." We did. And that's what led us to the next issue in the case.

We weren't obliged by your order to supplement other discovery requests beyond the ones that were specifically addressed, which we did, but we looked at the others and that's what led us to say, well, let's look at -- because there were some references to these two email addresses -- let's look at the emails. We had the emails forensically reviewed. They extracted the ones that had references to the same search terms that they had identified and we had them their emails, their Outlook files. They come in their natural format. Their native format is a collective PST file which captures all of the emails and attachments in them into one file which if you want to run a forensic examination tool, Relativity or one of the others, on it you certainly can. It's very easy to do so. But Rule 34 doesn't require that we do.

Again, Ms. Nelson came back and said wait a minute when I said we're not going to do that. If you want to, you can. The people who did it for us, Beam Forensics, are very good and they're reasonably priced, they'll do it for you for 2200 bucks, and they don't seem to have taken me up or Beam Forensics up on that estimate to go through and create the DAT file and the PDFs numbered that they want. I don't need them. My client doesn't need them. They can certainly do that.

Our response to the ESI presentation was to make that suggestion. We've produced the documents to you in their native format, which is all Rule 34 requires. It's easy for you to search them as it is for us and if you want to use a Relativity or similar

tool to do so, throw them into the machine and it will generate it out to you.

THE COURT: Does that comply with the terms of the ESI agreement?

MR. RIGRISH: The ESI agreement has a lot more requirements to it and I told them I'm rescinding that agreement. It's not a court order. It was overbroad and way too complicated. I try not to do business that way. I like to make discovery, as Rule 1 tells us, quick, careful, you know, economical for the parties involved.

There's nothing in the ESI agreement that says we have to bear the cost of creating this Relativity file if they want one. So my suggestion to Ms. Nelson at the time in mid May was Beam can do this for you. It will cost you 2200 bucks. Go ahead. If you want them do -- and if you create Bates-numbered PDFs from it, I'd be happy to get a copy and that's not happened.

So when we look at what the Court's two orders are we have complied with the Court's orders. The last category of that goes to this Interrogatory Number 12 and Production Request Number 35. When we first answered Production Request Number 35, we said we haven't identified anything. I'm sure the Court won't recall, but I didn't know about the second round of discovery requests which were served in January, but nobody told us about it until later in February, I think in late February, and then we answered that discovery prior to the hearing on March 12th.

In our review at that time, we did not identify any documents

responsive to RFP Number 35 which together with Interrogatory Number 12 asks have you got any cease and desist letters? Have you been sued, that sort of stuff. Now, we haven't been sued. We didn't identify anything and plaintiffs haven't identified anything to suggest that. If they did, they'd get it off Pacer and we would have known that immediately.

What they've identified were documents that they seized WhatsApps on September 15th that suggests that someone, a customer -- and by "customer" I mean the convenience stores who buy from Trident -- has said this doesn't look right, this is funny, this is fake, whatever. Those are what they identified.

When we answered the RFP 35 to start, we said we haven't identified any. But you guys have a bunch of documents. If you do, please tell us what they are and they finally have with these and there's not much there. But they've had 35,000 pages of documents to go through with their search tools and they haven't found any.

Sometimes you don't discover proof of willfulness because there's no willfulness and I understand they're reaching out for that and seeking discovery of that and we have answered in good faith to provide the documents that they may think will support that. But we don't see it and clearly they don't either, that's why they're asking for it as a discovery sanction to get the willfulness determination.

But that last category, again, is -- well, the sort of last piece of the three pieces. The first is our compliance with the orders. The second is that we did a 26(e) supplement where we pulled

those emails and produced them and suggested that if they wanted to have a Relativity run on it that they do so and did that. Not in dispute now is that we've complied with the Court's order about identifying purchasers -- who we purchased from and who we sold to with the spreadsheets.

So what we then have left is Interrogatory 12 and RFP Number 35 where we said we've looked -- we haven't identified what you're asking about. We've never been sued. The cease and desist letter we've seen is one that they were given on September 15th when they did a seizure and, in fact, the one other instance that we've even heard about wasn't counterfeit. It was some expired batteries with Duracell that BIC's investigator reached out to Duracell and said, hey, these guys have expired batteries there. When Duracell reached out to our guys they said, okay, we're not going to sell expired stuff. It was turned in years ago. So it's just not there. There's no there there.

They've had ample and fulsome, to use Ms. Nelson's term, discovery to the tune of about 26,000 pages -- PDF pages of documents from us primarily the purchase orders and sale inventory. They've got spreadsheets that summarize that. They have that same information, to a significant degree, from what they seized on September 15th and they have from their seizure on September 15th and now from the two phones and the email addresses. If there is anything else, it's in there. That's where it would be.

Just as an example talking about the email addresses. A big

part of the contents of those email addresses were solicitations from BIC and from BIC's authorized resellers, including a company called Sessions up in North Carolina which is who we've been buying from since, soliciting Trident to buy BICs. Okay. That's fine. Most of the references to BIC that appear in those emails are either BIC or its registered agent trying to sell them to us, that's it.

It breaks into three packets. We've complied with the orders. The order doesn't go as far as their motion and reply suggests it does which is to say we had some obligation to supplement other discovery requests if we didn't see it. We have done a 26(e) further inquiry of emails and told them that they were responsive to a lot of your requests.

We have complied with our discovery obligations. The report we got we thought was complying and still believe it's compliant with what the Court asked for on March 12th and what was actually then produced with Trident incurring the additional expense of having this turned into a Relativity file which we did and provided to them in May, we hear no complaints about that now either.

So the gist of this is we've complied with the Court's orders. We have engaged in good faith discovery. We're awaiting some responses from BIC to some discovery later this week. Hopefully we won't have to come back to you on that that they'll answer those questions.

But the one point that Charles raised that I think we should address is this question of statutory damages. This is something I

expect we'll explore more when we get to summary judgment. But you don't get to statutory damages automatically. You only get there if you can't accurately estimate your actual loss, your actual damages, which is one of the things we've requested, or you can't get the defendants' profits on what they sold that was in violation.

Again, my client's not a counterfeiter. My client sold some counterfeit goods, apparently, that's what the accusation is and we're working on -- we know what his cost of goods sold were and that's in the spreadsheets versus what he got paid for it. But we still have to lay on top of that our overhead. But we're looking at -- there is a measure of damages here that we don't get to statutory damages and shouldn't if BIC is forthright with their discovery responses.

Thank you, Your Honor. If you have any other questions, I'm happy to answer them.

THE COURT: All right. Thank you very much.

Mr. Henn, I'll let you have the last word. I'd like you to focus on a sort of going-forward basis. I think I understand where we've been. Let's focus on where we're going from here. What is it that you believe you are missing?

MR. HENN: All right. Let me start by answering that question.

Counsel appears to have decided that based on the seizure and the production of two phones that happened to be onsite the date of the seizure and then these generic emails that we, quote, have

everything. We know that that is not the case because, as we presented in our papers, there are email accounts from other employees or people affiliated with the defendants who are communicating on a regular basis about buying and selling BIC lighters. We list several names in our papers. I've mentioned them before. Nazar, Amir, Sadiq, Achmed. There may well be others.

The point here is basically the same as what Judge Pannell talked about in the Collins Williams' case that we cite in our papers which is discovery requires counsel to meet with a client, identify the custodians, interview them, make sure you have all of the custodians, pull from their relevant accounts and then produce those materials.

So, at a minimum, what we need going forward is that exercise to occur and for the email accounts and WhatsApp accounts and phones, including their text messages, of those individuals and any others that counsel identifies as relevant custodians to be provided because we don't have those, that's number one.

Number two is that the ESI agreement should be enforced. We cite a couple of cases in our papers. The 777 Partners case out of the Southern District of Florida is directly on point. It's a situation where a party had signed an ESI agreement and then didn't abide by it, and then they said, oh, but it's not a court order so we'll just not do that and the district judge threw the book at them, sanctioned them under Rule 37, and said, no. When you sign an ESI agreement on behalf of your client it is essentially like having an

enforceable order of the Court because I don't want to get involved in everybody's ESI. I want you to make agreements. I'm going to enforce them. When you ignore them there will be sanctions and I think that any --

THE COURT: I think a party has a right to rescind the agreement if it wants to. The question is the timing of it, right. From what I gathered, the rescission didn't come until after the request had already been made.

MR. HENN: Exactly.

Basically what happened was there was -- the production of the phone data was improper so we asked for it to comply with the ESI agreement. They did eventually get it compliant with the ESI agreement just as to the two phones.

Then when they made a supplemental production a month after the Court's April 13th deadline to supplemental discovery of those @sales and at -- whatever the other one was -- purchases or something email accounts, those general email accounts, those came as PST -- a big PST file. We said, hello, we're still operating under this ESI agreement, the same thing we had a month ago when the Court ordered you to supplement, it was in place. You're now again violating the ESI agreement, that was when we got the we're rescinding it so we're not going to abide by it. Our assumption was that when the Court ordered supplementation we were operating in a world where that ESI agreement was still in place because it was until it was unilaterally rescinded thereafter.

I do want to just address two quick points that were raised. It sort of deals with going forward but it also deals with the appropriateness of sanctions.

First, counsel is taking the position here that he was only obligated to look at one or two interrogatories and a couple document requests and he read from a part of the transcript from the motion to compel hearing and conveniently left off the last half of a sentence that I think is pretty important.

It's Page 30 of the transcript and it says -- the part that counsel read is in there. "I will urge counsel to review all the responses that have been served to date in light of this conference. I would say that it would be prudent to review all of them," that's where counsel stopped. But what you said was and the rest of that sentence "and make sure that the production is complete. I will give you 30 days to make this production and so that will be due on April 13th."

So this court was very clear about reviewing all of the requests and making sure the production was complete which it clearly isn't and that's why we're here. We need the production to be complete so that we can move this case forward and finally get it to completion.

THE COURT: All right. Thank you.

I'm going to ask counsel for BIC to prepare a proposed order and email it to chambers. It should be no broader than the motion. But feel free to make it narrower and I will take it under advisement

and we'll get an order entered as soon as we can.

MR. HENN: Should we include modification of the schedule in that order, Your Honor?

THE COURT: Yes. For that part confer with counsel and see if you can -- if you have an agreement on that on extensions of deadlines.

MR. HENN: Very well.

THE COURT: Okay. Anything else for us to take up today?

MR. HENN: Not from the plaintiff, Your Honor.

MR. RIGRISH: I'm afraid we're going to be here next week on BIC's discovery responses, but I hope not.

THE COURT: I hope not either. If there is an issue after you've exhausted efforts to confer, then utilize our procedure.

MR. RIGRISH: I'm familiar with your standing order and we'll abide by it absolutely.

THE COURT: Okay. All right. Thank you.

Mr. Winograd, always a pleasure to see you.

MR. WINOGRAD: Good to see you, too. I have regards to you from Joe Newman.

THE COURT: Okay. All right. Tell him I say hello.

MR. RIGRISH: Do we get pictures of Bethany's baby?

THE COURT: Hopefully she's not checking emails right now.

MR. HENN: I would like to think not. But she texted me right before I went in. So she needs to stop that.

THE COURT: All right. Good to see you all. We're in

recess.

(Proceedings concluded at 5:20 p.m.)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

CERTIFICATE OF REPORTER

I do hereby certify that the foregoing pages are a true and correct transcript of the proceedings taken down by me in the case aforesaid.

This the 30th day of June, 2026.

/S/ Alicia B. Bagley _______
ALICIA B. BAGLEY, RMR, CRR
OFFICIAL COURT REPORTER
(706) 378-4017